We'll hear the next case, Pepetti v. Rawlings Financial Service. OK. You can proceed. May it please the Court, my name is Benjamin Wolfe and I'm a partner at Jones, Wolfe & Capasi and I represent the appellant, Anthony Pepetti. Anthony's appeal focuses on two issues. One, whether the district court erred by deciding that Rawlings was not a debt collector under the FDCPA and two, raised by Rawlings for the first time on appeal, whether Anthony has Article III standing. It's respectfully submitted that the district court's decision should be reversed as Anthony's debt was in default when Rawlings first had the right and responsibility to collect it when Rawlings sent the Rawlings letter to Anthony and that Rawlings has always had and continues to have standing to bring his FDCPA claims against Rawlings because he has set forth a, quote, informational injury. Rawlings was a debt collector under the FDCPA based on two very different letters in this case. First, we have the January 21, 2015, Oxford letter sent on Oxford's letterhead to Gerald Pepetti, who is Anthony's father, and a non-party. The Oxford letter to Gerald Pepetti states the following. In bold, capitalized font, it states, Audit Notice, Response Required. Second part of the letter, as part of our ongoing effort to control the cost of healthcare, and I highlight the word our because it clearly refers to Oxford as it's on Oxford's letterhead. My third point about the letter is that it also states, regardless of how the situation arose, Oxford is due reimbursement for claims. And my next point is based on a reference number and I'll explain why that's relevant shortly. The reference number on this letter is H795910. And finally about this letter, the signature line is from Oxford. And notably, this Oxford letter fails to state my client's name. Anthony's name is nowhere to be seen on this letter. It only states my client's father, Gerald Pepetti. The question with respect to this letter is whether Rawlings had obtained the debt by that point, right? That's the question. I would say that that's a question that Judge Engelmeyer brought up. I'm not sure that that's the question that can decide whether or not this case gets either reversed or remanded. Well, but you have to first show that the debt was in default by the time it was obtained. So we need to establish when it was obtained. Right. And I think if you look at the transcript from summary judgment and also the pre-motion conference, and I think we have to look at those transcripts as a whole and not an isolated question and answer that I had with Judge Engelmeyer. And I think if you look at the pre-motion conference and you also look at the summary judgment argument, one of the things I was trying to talk about was this controversial paragraph in the statement of facts, which seems to, you know, indicate that it was from Rawlings, that this first letter was from Rawlings and not Oxford. And I just don't think that that's a reading of both the joint statement of facts. And I don't think that that's an honest reading of this letter. And I think one of the arguments that we made in our brief is that— The letter says that Oxford has asked Rawlings to process the reimbursements when they are due. Correct? It does say that in the letter. Does that not suggest that Rawlings has obtained the debt? It asks the recipient to contact Rawlings to discuss payment. I just don't think so. And frankly— But that's what the letter says. Well, it says to contact them. But I think— And it also says payments should be submitted to Rawlings. So Your Honor, I don't want to answer your question with a question, but my question would be, why isn't this on Rawlings' letterhead then? Why doesn't it have a payment coupon like the second letter? Why doesn't it have all the FDCPA notices on it? Why doesn't it have the New York City debt collection notice? And most importantly, why is it signed from Oxford? And the reason is, is because Rawlings didn't have—and I thought this was an interesting point from the judge's decision, because he cited Judge Coates' Franceschi decision—I hope that's how you pronounce it, my Italian is not good—and then I didn't understand why he didn't then rule in our favor. Because Judge Franceschi's opinion—I'm sorry, Judge Coates' opinion in Franceschi specifically said that obtain is when you actually have the possession and the right and responsibility to collect the debt. And when this first letter is sent, first of all, it's not even sent to my client. It's sent to his father. It's got a different reference number. So I'm not sure what they're trying to collect in this debt. But most importantly, they clearly didn't have the right and responsibility to collect the debt because there's no payment coupon. That's the difference. That's why we have to look at these two letters differently, right? The letter is saying that Rawlings is responsible for administering and collecting the debt. Isn't that what it says? They might be. That's what it says, but they're not actually engaging in debt collection at this point. They're not engaging in recovery. That's not what they're doing. All they're doing is an audit. The question is whether it's obtained the debt. Right. And I think obtained doesn't necessarily mean the equivalent of me coming over to Your Honor and giving you this letter. I think that Judge Coates' decision says something different, that there's a sense of responsibility and the right to actually engage in debt collection. And you can see, and as we've cited, we cited the Avila decision, which is from the Seventh Circuit, but the Miller case has talked about this idea of the proverbial price of poker going up. And that's what we can see happen between this first letter and the second letter. Because now at the second letter, we've got all the FDCPA notices. We've got the New York City license number. We've got a payment coupon. I'm actually holding up the wrong thing. This is on video. But we actually have a payment coupon, and it's actually sent to my client, as opposed to this first letter, which isn't even sent to my client and has a completely different reference number. So just on that point, because again, I think Judge Engelmeyer asked me that oral argument, I think certainly this debt was in default when, at the first time, that Rawlings actually had the opportunity and the duty to engage in debt collection. And that was right before this February 6, 2015 letter was sent out to my client. And one of the things we know is an internal document from Rawlings which talks about what someone's supposed to do, or the answer you're supposed to give when someone calls Rawlings like my client called, and what it says. And what it says is, why was my account referred to a collection agency when I was notified by my insurance company? This is the joint appendix, page 137. And the answer that someone on the other line from Rawlings is supposed to give the caller is the initial notification is from the insurer. So in this case, it would have been Oxford. We have been contacted to handle calls to process payments on behalf of the insurer. If payment is not made, then the amount due is considered in default, and Rawlings will generate future collection notices, which is exactly what they did here with the February 6, 2015 letter. Judge, I've got about a minute and 15 minutes left. Would you like me to address the standing issue, or anything on this particular issue? Whatever you like. I think I'll just address standing very simply. I just don't understand, first of all, why they never bring this from the beginning. And I just don't understand that issue now. We've clearly pled what's been referred to post-spokio as an informational injury. This has been done the country over. Most recently in this court, back in December, in this court's Shubell decision, and Your Honor, I know you were on that panel, against Comenity Bank. And one of the things that can establish standing after spokio are these types of informational injuries. And here, what we allege is that under Section 1692G of the FDA— Am I right that the violation, the alleged violation, is that the letter referred to the reverse, notices are on the reverse, and instead of being on the reverse, it's on a separate sheet of paper? Or is there more to it than that? There's more to it, and I think I alluded to that in the letter we uploaded last week. There's actually two G violations, and Rawlings didn't bring that up. The first is that it's on a separate second page. And the second part of it is that if you look at—this is, again, this is the Joint Appendix, page 483—is that there's also an overshadowing argument. And as we know from the statute, you're not allowed to put anything else in the debt collection letter that overshadows the consumer's right to the G notice. And so if this gets reversed, my guess is that Rawlings will probably make another summary judgment motion on the merits, similar to their motion to dismiss. And it talks about how the language that talks about Method 1 and Method 2 overshadows the Section 1692G notice, which is on this separate page. All right. Thank you. I'm going to let you reserve some time for rebuttal. Good morning, Your Honors. Richard Cohen from Lowy, Dannenberg, Cohen & Hart for the defendant, Appellee Rawlings. Your Honor, focused incorrectly on the right question here, which is when did Rawlings obtain the debt? And this was not a Rule 12b-6 motion. This was a Rule 56 motion following seven months of discovery. When Judge Engelmeyer ruled on Rule 12b-6, he accepted as true as he's required the pleadings, which said that Rawlings hadn't obtained the debt until after they sent the debt collection notice. Discovery proved otherwise, and the court below, at least three times in its decision, pointed to the fact that we had deduced evidence that we obtained the debt by no later than January 21, 2015, when Rawlings sent the first letter, and that the defendant did nothing more than speculate that we hadn't. The evidence includes joint... What about the argument that the January 21st letter was on Oxford's letterhead? It was, and as the court pointed out, that letter, in at least three, I think maybe four places, directed that everything be conducted through Rawlings. If you want to question it, call Rawlings. If you want to work it out, call Rawlings. If you want to pay, send the check to Rawlings. As a matter of record evidence, the Master Services Agreement at Joint Appendix page 373, which is the Oxford addendum, specifically requires Rawlings to mine Oxford's pharmacy data to identify, investigate, and recover potential overpayments due to coverage expiration, which is the precise set of facts presented by this case. In the Rule 56.1 statement, the parties agree that Rawlings sent the January 21, 2015 record in the first Shurcliffe affidavit at Joint Appendix page 58. That's May 26, 2016. Mr. Shurcliffe testifies as to the process and says that Rawlings gets the raw data, not assignments of debt or identifications of debt from Oxford. They get raw data, they mine it, and they do what they're required to do by Appendix J of the Master Service Agreement, mine it, identify it, and collect it. The second Shurcliffe affidavit, July 1, 2015, Joint Appendix pages 152 to 156, rebuts the speculation that the plaintiffs asserted on the summary judgment motion that a second Oxford assent was required before Rawlings was authorized to recover and collect the debt. He said that's not the process, that's not how it works. The MSA provides this, I've been doing this seven years, this is the way it's always done. We get raw data, we find the overpayment, we collect and recover it. So Rawlings arranges for Oxford to send the first letter? No, Rawlings sent it on Oxford letterhead. Oh, that's what I'm asking. Rawlings triggers the sending of the letter? Not just triggers it, they actually prepare it and send it. And consistent with... Who signs it? It's unsigned, it's stamped. Consistent with... Stamped with whose name? Stamped Oxford. And it says, call Rawlings, pay Rawlings, consult with Rawlings. Consistent with the Fair Debt Collection Practices Act, this is purposes. The first notice that goes out bears a name that the insured is going to recognize. The insured is insured by Oxford. It has an Oxford letterhead and it says to resolve this through Rawlings. So it's not there to scare the insured that he has a debt in default and that there are any adverse consequences coming up. It's an audit notice, it's been identified, resolve it with Rawlings. The facts of the matter are that under the agreement between Rawlings and Oxford, Rawlings had obtained the debt by no later than the time they sent out the first letter, as Judge Engelmeyer found. Why don't you address the second part, when was the debt in default? Well... Or was it in default at that time? The record is pretty clear here, Your Honor. There's been at least two concessions by the plaintiff that the debt was in default at some point between the two letters. That's at Joint Appendix, page 42, lines 7 to 8, where at oral argument on the summary judgment motion, the court said, help me with respect to the text of the exemption. What you're saying is there isn't a default, I think, until the second letter. Mr. Wolfe, Rawlings, right, in terms of the exemption, the court correct Mr. Wolfe, yes. And then Mr. Wolfe said, I'm sorry to interrupt, Your Honor. At some point between the two letters. There was an earlier on-the-record admission at Joint Appendix 26 that the court... So on the record, the first letter goes from Oxford letterhead on January 21. You are not saying it is in default then, are you, Mr. Wolfe? No. And then Mr. Wolfe goes on to say that at some point between, before February 6th, maybe February 3rd. But it's a matter of record evidence that this debt was not in default until sometime after the January 21, 2015 letter. And that's consistent with Alibrandi, which says there must be a period before, between the time a debt becomes due and it goes into default, consistent with the purposes of the Fair Debt Collection Practices Act. It's anomalous that we have the plaintiff here trying to say, no, I was in default earlier, which triggers a cavalcade of adverse consequences for debtors. Your Honor, on the Article 3 issue, there is nothing more than the notice which the consist, complies with 1692, it was inadvertently on a separate page, unstapled to the first page of the notice, which did say refer to the reverse side and the reverse side was blank. You didn't make this argument below? We did not make this argument below. Couple points, Your Honor. First of all, we were just retained for the appeal. But secondly, Spokio was decided after the motion was put in, after the summary judgment motion was first filed and for whatever reasons, counsel down below didn't think to raise it before the court. But Your Honor, it's a real issue. These kind of make-weight, no-injury cases are precisely what Spokio is intended to drive out of the courts. The Fair Debt Collection Practices Act is a serious act intended to curb abuses. What we have here is a slip and nothing more than a slip. And I can even quote from Strubel, where of the four claims, Strubel v. Comenity Bank, where I recognize Your Honor was on the panel, and of the four TILA claims, two were tossed on Article III standing grounds and distinguished between substantive and procedural violations. And I'm looking at where the court says that a bare procedural violation is not a concrete injury. And what is a bare procedural obligation? Well, that requires us to agree that it is a bare procedural violation. I mean, there's an allegation that it's fraudulent and misleading. Well, we're past the allegation stage, Your Honor. We're well past that. This plaintiff was not injured. In fact, he received a windfall out of all this. He got his prescription drugs, he got his insurance coverage, and he got $600 to boot, which he hasn't refunded yet. He's up. He's up on the house here. What this court defined as a bare procedural violation is where the disseminated injury, what is not, what is a concrete injury and not a bare procedural injury is where the disseminated information is inaccurate. So a bare procedural violation may not demonstrate concrete injury because, one, the disseminated information, regardless, may be entirely accurate. That describes what happened here. That second unattached page had the precise information required by the Fair Debt Collection Practices Act. Or two, the misinformation may be too trivial to cause harm or present any material risk of harm. And we also have that circumstance here, Your Honor. So on both counts, this is a bare procedural violation detached from any real-world actual injury. Thank you. Thank you, Your Honor. We'll hear the rebuttal. Your Honor, just briefly on the Article III issue, it's just behind me why they won't concede that there's an overshadowing argument, which is actually from the statute in Section 1692G. They didn't put it in their papers, and they couldn't even say it now, and that's clearly the type of informational injury that was left in with the two TILA violations in Strubelle, that there are certain things that a consumer is entitled to get. They're entitled to get a proper 1692G notice and also no other information in the letter that overshadows their right to, within the 30 days, to dispute the validity of the debt. That's the type of informational injury that a lot of the cases post-spokio have talked about. This Court's Strubelle decision, the Accredited Health decision in the Eleventh Circuit. So I just don't understand how they don't see the informational injury here conferring Article III standing. It's just, again, I don't see how this could, how this first letter could be from Rawlings and how at that point in time they had the responsibility to collect the debt. Because if they did, then there'd be a payment coupon, right? They would want a very easy method for my client to have a sent-back payment. So that's that point. And then this issue of the windfall. Again, that's just a complete misleading point about the facts of this case. The facts of this case are we filed a complaint and several months later, after we filed this class action complaint alleging FDCPA violations, serendipitously my client got a check. Maybe that's just good lawyering. Maybe it's not. But this isn't the case where my client got a check first and then we filed our complaint. The facts are that we filed the FDCPA complaint. Several months later, out of the blue, he got a check, which I believe is still in his account. I can take any other questions. In his account? I'm sorry. It's currently in his account. We had told him. I believe we've instructed him not to do anything with it until this litigation's over. But again, he got that check after we filed this FDCPA complaint, after the Rawlings letter. The only letter sent to him in this case was given to him, the February letter. Thank you. We'll reserve the decision.